UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:16-CV-80195-KAM

GERALD GAGLIARDI, et al.,

Plaintiffs,

vs.

CITY OF BOCA RATON,

Defendant,

and

CHABAD OF EAST BOCA, INC., et al.,

Intervenors.
_______________________________________/

**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COMPLAINT**

This matter is before the Court on Defendant City of Boca Raton's Motion to Dismiss (DE 48) and Intervenors' Motion to Dismiss (DE 49) Plaintiff's First Amended Complaint (DE 46). For the foregoing reasons, the motions are granted.

## I. Background

Plaintiff's First Amended Complaint (DE 46) alleges the following. In 2007, a religious entity called the Chabad of East Boca, Inc. (the "Chabad") was engaged in a potential acquisition of residential properties in a residential area in the City of Boca Raton (the "City") known as the Golden Triangle. (DE 46 ¶ 13.) The Chabad intended to assemble the contiguous single-family residences for religious purposes, including conducting religious services and operating a religious school. (DE 46 ¶ 16.) At the time, the Golden Triangle area was zoned for single-family residences

and was adjacent to a community redevelopment project of the City known as Mizner Park. (DE 46 ¶ 17.) Mizner Park consists of a mixture of high-end retail establishments, restaurants, and residential apartments, and is a major source of revenue for the City. (*Id.*)

When Chabad's intentions became publicly known, Golden Triangle residents formed opposition groups to voice objections to the City permitting the Chabad's religious operations in their neighborhood. (DE 46 ¶ 18.) Such opposition was motivated by religious animus together with a desire to protect the residential quality of the Golden Triangle neighborhood. (*Id.*)

In late 2007, the City introduced Ordinance No. 5014 to allow "places of worship" as a permitted use in a single-family zoning district such as the Golden Triangle. (DE 46 ¶ 19.) At this time, the majority of places of worship were located in single-family zoning districts, but they were not the subject of any land use restrictions in those districts. (*Id.*) Ordinance No. 5014 would have allowed the Chabad to introduce its full program of religious activities into the Golden Triangle neighborhood, subject to additional parking requirements set forth in the ordinance. (*Id.*)

At public hearings, in the media, and in private conversations with City elected officials, Golden Triangle residents expressed the desire to completely prohibit all Chabad operations in their neighborhood. (DE 46 ¶ 20.) The issue became "extremely contentious." (*Id.*) The City was also concerned that the proposed location of the Chabad was too close to Mizner Park, which was the venue of numerous public concerts and events and which was an attraction where the general public would stroll the sidewalks and frequent outdoor dining and retail establishments. (DE 46 ¶ 21.)

The conflict between the Golden Triangle community, the Chabad, and the City was the focus of much publicity and led to secret discussions between the City, the Chabad, representatives and attorneys for the Golden Triangle residents, and a local developer. (DE 46 ¶ 22.)

The local developer owned a small vacant piece of land (the "Property") outside the Golden Triangle and Mizner Park area. (DE 46 ¶¶ 23, 30.) The Property is located at 770 Palmetto Park Road and consists of 0.81 acres of developable property that is approximately 400 feet from the Palmetto Park Road Intercoastal Waterway bridge. (DE 46 ¶ 30.) At the time, the applicable zoning to the property did not permit construction of a "place of worship," such as the Chabad, and due to the intensity of the use the complex would impose on the surrounding area. (DE 46 ¶ 42.)

In January 2008, the City, through its City Council, declined to proceed with consideration of the previously introduced Ordinance No. 5014. (DE 46 ¶ 41.) This decision was based upon public opposition to the ordinance and despite legal advice that federal law and existing land development law justified the ordinance. (*Id.*) On March 25, 2008, the City's manager stated at a public meeting of the City Council that the City staff was working on the issue of "places of worship" and that a report by the City's staff would be provided to the City Council in May or June 2008. ( *Id.*)

Around the same time the City deferred action on Ordinance No. 5014, the Chabad and the developer who owned the Property were engaged in discussions about the potential construction of the Chabad on the Property. (DE 46 ¶ 42.) At this time, however, the Chabad, the developer, and the City were aware that the Chabad could not be constructed on the Property due to City zoning laws that prohibited "places of worship." (*Id.*)

In a "political act" to appease the Golden Triangle residents, to alleviate the City's concerns regarding the Chabad's impact on Mizner Park, to financially benefit the developer, "and to unconstitutionally advance and create a special privilege for the religion of the Chabad," the City initiated a change of its zoning code "without regard to the constitutional rights of Plaintiffs." (DE 46 ¶ 43.) The City's manager directed the Planning and Zoning Staff to perform all work necessary,

including staff reports and recommendations, to change via ordinance the permitted use the Property to include "places of worship." (DE 46 ¶ 44.) This "secretly planned" change of permitted use was for the "sole purpose" of allowing construction of the Chabad on the Property. (*Id.*) With the "secret directive" given to develop a process to ensure that the Chabad would be allowed to build on the Property, City staff advanced the issue by composing new definitions for permitted "uses" under the definition of "places of public assembly" in the City's Code of Ordinances. (DE 46 ¶ 46.)

On May 28, 2008, without the "promised" report regarding prior Ordinance No. 5014, without any public comment on Ordinance No. 5014, and without any discussion by the City Council at a public meeting or hearing on the issue of "places of worship," the City introduced Ordinance No. 5040. (DE 46 ¶ 47.) Ordinance No. 5040 limited "places of worship" in a residential district (which had the opposite effect of proposed Ordinance No. 5014) and added "places of worship" to the City Code definition of "places of public assembly." (*Id.*) In effect, Ordinance No. 5040 would prohibit the Chabad from building in the Golden Triangle area, but would allow the Chabad to build on the Property. (*Id.*) Ordinance No. 5040 was "tailor-made" for the Chabad's benefit. (DE *Id.*)

The City held public hearings regarding Ordinance No. 5040 on July 22, 2008, August 26, 2008, September 8, 2008, and September 9, 2008. (DE 46 ¶ 48.) The City adopted Ordinance No. 5040 at the September 9, 2008 hearing. (*Id.*) At no time were the "secret" meetings and agreed-upon arrangements between the City, the developer, and the Chabad disclosed to the public or the Plaintiffs. (*Id.*) Nor was the purpose of the City, the developer, and the Chabad to reconfigure City law by placing new restrictions in residential neighborhoods for houses of worship, and expanding "uses" for houses of worship under "places of public assembly" disclosed to the public or Plaintiffs. (*Id.*) Also, at no time was it disclosed to the public that the adoption of Ordinance No. 5040 was for

the primary purpose of advancing the Chabad's religion regardless of public safety and at the expense of the surrounding areas (*Id.*)

After the undisclosed agreement between the City and the Chabad for the Chabad to abandon its plans to conduct religious activities in the Golden Triangle and Mizner Park area, the City and the Chabad agreed, in private conversations, for construction of the Chabad building to be located on the Property. (DE 46 ¶ 49.) To "consummate its illegal, secret agreement" with the Chabad and the developer, and to issue all necessary approvals to allow the construction of the Chabad's religious project, the City needed to grant numerous "unlawful" variances and "favorable, intentional[,] and erroneous" interpretations of the City's Code. (*Id.*) Through these acts, the City "continued to grant the Chabad numerous and special privileges." (*Id.*)

After obtaining the change of permitted use of the Property through Ordinance No. 5040, the Chabad filed applications to construct a two-story, 18,364 square foot "place of public assembly" (which was now defined to include a "place of worship") on the Property. (DE 46 ¶ 51.) The building application requested a variance to increase the height of the building to 40 feet and eight inches, which exceeded the 30 foot maximum allowed for the Property. (*Id.*) The Chabad also proposed inadequate parking based on City-mandated parking requirements. (DE 46 ¶¶ 53, 55.) The City granted a variance for parking and access to the Chabad. (DE 46 ¶ 55.) The proposed building and improvements of the religious structure encompassed 95% of the area of the Property, which was far in excess of any other non-religious building in a similar B-1 zoning district. (*Id.*)

On May 7, 2015, based on the mandate from the City's manager and recommendations from the City's staff, the City's Planning and Zoning Board conducted a final public hearing on the Chabad's application. (DE 46 ¶ 57.) Based upon the prior undisclosed agreement between the City,

the developer, and the Chabad, the Planning and Zoning Board approved the building. (*Id.*) This approval was allegedly based on the City's staff's "predetermined and directed recommendations" to move the Chabad from the Golden Triangle to the Property. (*Id.*)

On May 27, 2015, the City Council approved the increased height of the building. (DE 46 ¶ 58.) This finalized the approval of the Chabad's application and was based on the recommendations of the City's staff "as directed" by the City's manager. (*Id.*) The City's deviations, variances, and "knowingly erroneous" interpretations of the City's rules, regulations, laws, and ordinances were "all conducted to advance the religious purpose of the Chabad." (*Id.*)

According to Plaintiffs, to grant the final approval of the Chabad's application and to complete the establishment of the religious project, the City "willfully and knowingly" permitted a prohibited use on the Property, ignored the building's parking deficiencies, ignored that the building was out of character of the neighborhood and "injurious to residents in the area" including Plaintiffs, allowed deficient parking for the building, approved a building that exceeded the allowable size, and approved deviations and variances that "did not meet legal criteria." (DE 46 ¶ 59.) The City was aware of the deficiencies of the Chabad's project yet granted deviations from the City's Code, ignored "mandatory" standards of the Code, authorized an impermissible size and height of the building, and intentionally interpreted the Code "in a manner to improperly advance the religious interest of the Chabad." (DE 46 ¶ 60.) Plaintiffs allege that any secular proposal of similar size and impact "would not have" received the "special treatment" the City accorded the Chabad. (DE 46 ¶ 56.) Plaintiffs also claim that no other religious entity has ever received similar City assistance in exceeding established land use laws, ordinances, and regulations in the history of the City. (*Id.*)

On February 8, 2016, Plaintiffs initiated this action against the City. (DE 1.) After this Court

dismissed Plaintiffs initial complaint for lack of subject-matter jurisdiction (DE 43), Plaintiffs filed an amended complaint. (DE 46). The amended complaint describes each Plaintiff as a"citizen and resident of the United States," [who] resides and is domiciled in the City of Boca Raton," and as "a member of the Christian religion." (DE 46 ¶¶ 9–10.)

Plaintiffs allege that the City's actions violate the Establishment Clause of the First Amendment[1], the Equal Protection Clause of the Fourteenth Amendment, the Due Process Clause of the Fourteenth Amendment, and the Florida Constitution. Plaintiffs further assert that the City's action:

> creates personal economic and noneconomic injuries to these two Plaintiffs in that their safety will be directly and negatively affected by impediments to emergency vehicles and services, which are located on the mainland, and increased flooding risks. There will also be traffic intrusion into their neighborhood including members of, and visitors to, the CHABAD parking in front of their residence, and impediments to ingress and egress from the neighborhood. Completion of the CHABAD further will alter the beach-oriented, relaxed, and low-intensity character of the Seaside Village, which is a primary reason for Plaintiffs' home ownership in the Seaside Village. Further, said Plaintiffs will assume the special burden of altering the vehicular and pedestrian access to their residences on a regular and daily bassi to avoid the injury created by the CHABAD's religious complex and the physical and metaphysical impact of avoiding the complex by the need to utilize other, significantly, less convenient, public roadways.

(DE 46 ¶ 72.)[2] The Chabad and the owner of the Property filed a motion to intervene, which the Court granted. (DE 14.) The City moved to dismiss Plaintiffs' amended complaint on various grounds, including lack of standing. (DE 48.) The Intervenors similarly moved to dismiss Plaintiffs'

---

[1] "Congress shall make no law respecting an establishment of religion...."

[2] Plaintiffs allege injuries similar to those specified in Count I's allegations relating to the Establishment Clause (DE 46 ¶ 72) in Count II's allegations relating to the Equal Protection under the Fourteenth Amendment (DE 46 ¶ 81), and Count III's allegations relating to Due Process under the Fourteenth Amendment (DE 46 ¶ 94). Count IV's allegations under the Florida Constitution do not specify an injury to Plaintiffs as a result of the alleged violation.

amended complaint, also raising lack of standing. (DE 49.)

## II. Legal Standard

Questions regarding standing implicate a court's subject-matter jurisdiction and "must be addressed prior to and independent of the merits of a party's claims." *DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1301 (11th Cir. 2008) (per curiam) (citation omitted). The party invoking the court's subject-matter jurisdiction bears the burden of proving the essential elements of standing. *Id.* "For purposes of ruling on a motion to dismiss for want of standing," the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

## III. Discussion

### A. Constitutional Standing

The "irreducible constitutional minimum" of standing consists of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). At the pleading stage, "the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Id.* (quoting *Warth*, 422 U.S. at 518) (alteration in original).

To establish the first element, injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1). To be "concrete," an injury must be "*de facto*," meaning "it must actually

exist." *Id.*

Plaintiffs contend that they "clearly allege[] the sufficient material elements establishing the injury imminent to be suffered by the Plaintiffs" in the amended complaint. (DE 57 at 4.) Plaintiffs then reiterate "material facts of standing" from the amended complaint. (DE 57 at 4-5.) These facts consist of the following: the conclusion that Plaintiffs are forced to suffer personal injury (DE 46 ¶ 7); that Plaintiff s respective residences are "approximately 100 yards" and "approximately 300 years from the real property which is the beneficiary of the Defendant's unconstitutional acts" (DE 46 ¶ ¶ 9-10); that the portion of Boca Raton described as Seaside Village is "on a barrier island with limited access from the mainland" and has a "high-hazard coastal area with increasingly frequent Intracoastal flooding" (DE 46 ¶ 24); that Defendant "did not consider that the development may not increase flooding or create a dangerous situation on the neighboring properties" (DE 46 ¶ 26); that "[f]looding is therefore inevitable even the slightest of storms can cause problems for the surrounding homeowners" (DE 46 ¶ 27); that the Palmetto Park Road Intracoastal Waterway bridge is approximately 400 yards from the residence of Plaintiff, MACDOUGALL and approximately 150 yards from the residence of Plaintiff, GAGLIARDI" (DE 46 ¶ 31); that "[f]ree access to East Palmetto Park Road and the Palmetto Park Road Bridge is essential" (DE 46 ¶ 36); and by reiterating allegations relating to the potential impediments to emergency vehicles, increased flooding risks, traffic-related issues, and potential alteration of the character of the surrounding area (DE 46 ¶ 72).

In support of Plaintiffs' assertion that standing has been sufficiently pled, Plaintiffs emphasize that "[s]tanding in an Establishment Clause case is not limited to economic injuries but also can be triggered by noneconomic injuries... ." (DE 57 at 5 (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486, 102 S.Ct. 752, 766

(1982)). Plaintiffs conclude that "[i]f the Establishment Clause violation forces someone to make a change in their behavior, that is a noneconomic injury." (DE 57 at 6.) Plaintiffs then provide a further citation to *Valley Forge*, noting that "[t]he party who invokes the power [of judicial review] must be able to show not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally...." 455 U.S. at 477. Plaintiffs then conclude their standing argument by directly copying Paragraph 72 of the amended complaint (DE 46) into their Response and by then turning to the assertion that "Plaintiffs have standing to challenge this action under both taxpayer standing and traditional Article III standing." (DE 57 at 6.)

Plaintiffs' assertions that they have established an injury in fact for purposes of this Court's subject-matter jurisdiction lack merit. Plaintiffs have failed to plead adequately a concrete and particularized constitutional injury in fact and are without the requisite standing to bring their action in this forum. Plaintiffs own quotation to *Valley Forge*, emphasizing that "[t]he party who invokes the power [of judicial review] must be able to ... that he has sustained or is immediately in danger of sustaining some direct injury... *and not merely that he suffers in some indefinite way in common with people generally*," emphasizes the infirmity in Plaintiffs' pleading. 455 U.S. at 477 (emphasis added). Far from the particularized and concrete injury required to confer standing, Plaintiffs have simply reasserted, again and again, a list of conjectural injuries to the whole of the area surrounding the proposed Chabad site, and potentially beyond.

Taking the alleged injuries in Plaintiffs' amended complaint as true, the Court cannot see a means by which these injuries are particularized to the Plaintiffs. Plaintiffs' alleged injuries are comprised primarily of an increased potential for flooding, increased traffic in the area surrounding

the proposed Chabad site, increased difficulty for emergency vehicles to access the area surrounding the proposed Chabad site, and the change in the character of the area.[3] (DE 57 at 4-5.) Such alleged injuries, impacting vast swaths of the surrounding population, represent injuries "suffer[ed] in some indefinite way in common with people generally" and are not the particularized and concrete injuries necessary to confer standing. *See Buena Vista East Historic Neighborhood Ass'n v. City of Miami*, 2008 WL 1848389, *5 (S.D. Fla. 2008) (emphasizing the requirement to show "a special injury or damage, different from that suffered by the general public"). Such broad, general grievances are not an adequate foundation for standing and halt this Court's ability to progress further. *See Taubman Realty Grp. L.O. v. Mineta*, 198 F.Supp 2d 744 (E.D. Va. 2002) (holding that alleged injuries "of 'safety, environmental, and traffic' related negative impacts to a 'region' clearly is not the type of 'concrete, litigant-specific interest upon which a party may base a procedural injury.'")

Even if the injuries alleged were sufficiently particularized to Plaintiffs, the type of injuries alleged are wholly conjectural in nature. Article III standing requires that the injuries alleged by "actual of imminent, not 'conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560. Plaintiffs allege Plaintiffs specify no further in the amended complaint or subsequent briefing how, or in what direction, property values will be altered by building the Chabad on the Property. injuries related to increased traffic, potential impediments to emergency vehicles, flooding risks to the barrier island, the alteration of the character of the surrounding area, and a passing reference to alteration in property values. These alleged adverse impacts on the surrounding area are "conjectural and speculative" in their nature. *See Buena Vista*, 2008 WL 1848389 at *5 (considering standing based

[3] The amended complaint also asserts, in a wholly conclusory fashion, that the Chabad's "ambitious plan" will "alter property values." (DE 46 ¶ 35.) Plaintiffs specify no further in the amended complaint how property values will be altered by building the Chabad on the Property.

on alleged injuries including "increased traffic congestion 'causing delays to residents, increase of danger to homes, and delays in emergency response time'"). The Chabad has not been built on the Property. The injuries caused by its existence represent only a potential, hypothetical outcome that may result from building the Chabad, not one that is imminent. Plaintiffs have not included any concrete allegations of actual damages that Plaintiffs have suffered or that Plaintiffs will suffer with the exception of a reference to traffic caused by a March 2015 fund-raising event, a diminimus assertion at best.[4] As we concluded *supra*, though, the increased traffic described by Plaintiffs is a generalized grievance impacting a vast portion of those citizens who live in the area, use the roads, or visit the area. As such, even if sufficiently concrete, Plaintiffs allegation of injury by way of increased traffic cannot survive our standing analysis. Accordingly, Plaintiffs have failed to adequately allege an injury in fact.

**B. Prudential Standing**

Alternatively, even had Plaintiffs' pled their alleged injuries with sufficient particularity and definiteness, Plaintiffs have failed to allege that those injuries were within the zone of interests protected by the Constitution's Establishment Clause and, as such, are without prudential standing to bring the present action.

"Prudential standing," unlike constitutional standing, is a doctrine "not derived from Article III and 'not exhaustively defined' but encompassing ... at least three broad principles: 'the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the

[4]Plaintiffs noted that "over 200 vehicles converged" on the Property "snarling area traffic and requiring police assistance" during a fund-raising event held at the Property. (DE 46 ¶ 33.)

requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked.' " *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386, 188 L. Ed. 2d 392 (2014) (quoting *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004)). In so doing, the Supreme Court "has required that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 475, 102 S. Ct. 752, 760, 70 L. Ed. 2d 700 (1982) (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Our prudential standing analysis is not fulfilled merely by simultaneously pleading an injury and an unconstitutional action by the Government. Rather, to meet the requirements of our zone-of-interest analysis the injury alleged must be shown to be "*as a consequence* of the alleged constitutional error." *Valley Forge Christian Coll.,* 454 U.S. at 485.

While "[t]he language of the Religion Clauses of the First Amendment is at best opaque," the Supreme Court has interpreted the Establishment Clause"with reference to the three main evils against which the Establishment Clause was intended to afford protection: sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S. Ct. 2105, 2111, 29 L. Ed. 2d 745 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970)). Accordingly, to fall within the "zone of interests" protected by the Establishment Clause, the injury must be one that comes as a consequence of the Establishment Clause violation, one in which plaintiffs "were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them." *Valley Forge Christian Coll.,* 454 U.S. 487 n.22 (describing the circumstances underlying the Supreme

Courts' conferral of standing in *Abington School District*, 374 U.S. 203). The injury must be more than an allegation of a "spiritual stake in First Amendment values" but instead be the result of the violation of the Establishment Clause. *See id.,* 454 U.S. 487 n.22 (discussing the standing requirement in *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 154, 90 S. Ct. 827, 830, 25 L. Ed. 2d 184 (1970), and contrasting it with the alleged injuries in *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)).

The Court cannot find a means by which the injuries alleged in Plaintiffs' Amended Complaint (DE 46) fall within the zone of interest of an Establishment Clause violation so as to confer prudential standing. Plaintiffs have not alleged that they have been subject to unwelcome religious exercises, nor have Plaintiffs alleged that they have been forced to assume special burdens to avoid religious exercise, nor have Plaintiffs own religious practices been impacted by the City's zoning decision. Indeed, Plaintiffs have not alleged any injury concerning religious activity–beyond noting that a party to the challenged zoning decision is a religious organization. Instead, Plaintiffs alleged injuries relate to increased risk of flooding, increased traffic congestion, increased difficulty of emergency service access, and changes to the character of the Plaintiffs' neighborhood. These injuries are not within the zone of interests protected by the Establishment Clause. Indeed, such injuries bear the clear hallmarks of a zoning dispute that incidentally involves a religious organization rather than a dispute about Government support of religious activity. Plaintiffs have merely invoked the potential for a violation of the Establishment Clause without alleging to have suffered the injuries that the Establishment Clause exists to protect against. As such, Plaintiffs are without the prudential standing to proceed on their claims arising from the City's alleged violation of the Establishment Clause.

Further, the injuries Plaintiffs allege are outside of the zone of interests of both the Equal Protection and Due Process Clauses of the Fourteenth Amendment. *See Valley Forge Christian Coll.*, 454 U.S. at 475 ("[P]laintiff's complaint [must] fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.' " (quoting *Assoc. of Data Processing Serv. Orgs.*, 397 U.S. at 153). Both of Plaintiffs' alleged violations of the Fourteenth Amendment rely on the same operative language to describe the injury suffered by Plaintiffs as follows:

> personal injury to these two Plaintiffs in that they will be directly and negatively affected by traffic intrusion into their neighborhood that will affect safety and emergency services availability and Seaside Village character, including members of, and visits to, the Chabad parking in front of their residences. Completion of the Chabad further will alter the beach-oriented, relaxed, and low-intensity character of the Seaside Village, which is a primary reason for Plaintiffs' home ownership in the Seaside Village. Further, said Plaintiffs will assume the special burden of altering the vehicular and pedestrian access to their residences on a regular and daily bais to avoid the injury created by the religious operation of the Chabad and the physical and metaphysical.

(*Id.* ¶¶ 81, 94.) None of these injuries, though, is of the kind that gives rise to a claim for violation of equal protection or due process. Rather, these are grievances arising from an unfavorable zoning decision, dressed in the cloak of a violation of fundamental, sacrosanct constitutional rights. This is not to say, of course, that municipal zoning decisions cannot violate the Constitution's guarantees of equal protection under the law and certain minimums of due process. Rather, it means that not every unfavorable or undesirable zoning decision rises to the level of a constitutional violation. Here, Plaintiffs have failed to plead injury to bring this zoning decision within the ambit of a constitutional violation and, accordingly, are without the prudential standing.

Plaintiffs passing reference to information and belief that the City "has not provided the same

privileges to a secular developer seeking to place a similarly intense project in the Seaside Village," as part of their equal protection challenge, does not cure Plaintiffs' prudential standing infirmity. (DE 46 ¶ 28.) This alleged injury is neither alleged to have been suffered by Plaintiffs nor are Plaintiffs alleging to seek relief on behalf of the secular developer. It is, instead a conclusory statement not expanded beyond a mere allegation. As Plaintiffs allege to be residents and do not allege to be developers, the Court cannot see a means by which the existence of this injury, taken as true, confers prudential standing on Plaintiffs. As such, Plaintiffs' alleged injuries are outside the zone of interest of the constitutional right through which they seek relief and are without prudential standing to proceed on their claims.

*C. Taxpayer Standing*

Plaintiffs also argue in their Response that they have "taxpayer standing." (DE 57 at 6.) This standing is asserted without additional authority or analysis. A municipal taxpayer has standing "when the taxpayer is a resident who can establish that tax expenditures were used for the offensive practice." *Pelphrey v. Cobb Cty.*, 547 F.3d 1263, 1280 (11th Cir. 2008); *see also Frothingham v. Mellon*, 262 U.S. 447, 486 (1923) (decided with *Massachusetts v. Mellon*) ("[R]esident taxpayers may sue to enjoin an illegal use of the moneys of a municipal corporation. The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." (internal citation omitted)). To rely on municipal taxpayer standing, Plaintiffs must demonstrate "a measurable appropriation or loss of revenue attributable to the challenged activities." *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 74 (2d Cir. 2001). Plaintiffs fail to identify an allegedly illegal use of taxpayer money. As before, their failure to do so forecloses any argument based on taxpayer standing.

## IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant City of Boca Raton's Motion to Dismiss (DE 48) and Intervenors' Motion to Dismiss (DE 49) are **GRANTED**. This case is **DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION**.

**DONE AND ORDERED** in chambers at West Palm Beach, Palm Beach County, Florida, this 27th day of March, 2017.

KENNETH A. MARRA
United States District Judge